## NORTHWEST TRANSP. CO. *v.* BOSTON MARINE INS. CO.

*(Circuit Court, E. D. Michigan. February 20, 1890.)*

**1. MARINE INSURANCE—CAUSE OF LOSS.**
Where a stranded vessel is voluntarily scuttled to save her from a storm which began several hours after she stranded, the proximate cause of the loss arising from such scuttling is the storm, and not the stranding.

**2. SAME.**
A vessel which was going in a fog at an immoderate rate of speed was stranded because the master changed her course two minutes before the vessel would have reached the proper place for turning, he supposing that she had reached such point. *Held,* that the stranding was not caused by the negligent rate of speed.

In Admiralty. On appeal from district court. 37 Fed. Rep. 220.

JACKSON, J. The material facts of this case, on which the questions of law arise and the rights of the parties depend, are the following:

The steam-propeller Ontario, owned by the libelant and valued at $55,-000, was in May, 1883, insured against total loss and general average, only to the limit of $49,500, in fire insurance companies, one of said fire companies being the respondent, whose policy was for the sum of $17,500 insurance upon the body, tackle, apparel, and other furniture of said propeller. In the body of the policy the adventures and perils which the respondent undertook to bear and take upon itself were those "of the lakes, rivers, canals, fires, jettisons," that should come to the damage of said vessel or any part thereof. It also contained the following exception to the general liability of the respondent or insurer: "Excepting all perils, losses, misfortunes, or expenses consequent upon, or arising from, or caused by, the following or other legally excepted causes: Damages that may be done by the vessel hereby insured to any other vessel or property; incompetency of the master or insufficiency of the crew, or want of ordinary care and skill in navigating said vessel, and in loading, stowing, and securing the cargo of said vessel; rottenness, inherent defects, unloading, and all other unseaworthiness; theft, barratry, or robbery." Indorsed upon the policy was the following: "This policy is free from any loss caused by or in consequence of fire, and covers against total loss and general average only." On October 11, 1883, while said policy was in full force, the the propeller, laden with a large cargo of miscellaneous merchandise, left the port of Sarnia, Ontario, bound for Duluth. She was in all respects properly officered, manned, and equipped. She had an amply suffi-

cient crew, with competent, experienced, and skillful master and mate, who were familiar with the route. Her cargo was properly loaded, stowed, and secured, and the vessel was entirely seaworthy, and free from rottenness or other inherent defects. Her cargo was insured by several companies other than respondent. The Ontario reached the port of Kincardine at noon of October 12th, and left there about 1 P. M. of that day, the weather being fine, the lake smooth and calm, with only a slight wind from the southward. The course after leaving Kincardine is N. E. by N. to Point Douglass. From there to the "Dummy," the entrance of Southampton harbor, the course is N. E. half E., which takes the vessel clear of the shoal at or near Nine-Mile Point on the east shore of Lake Huron. This portion of the route from Kincardine to Southampton is usually run on time, and the course of vessels is maintained from Kincardine until Point Douglass is passed; then it is changed by porting for Southampton. The master of the Ontario went off watch, and the mate took charge of the vessel's navigation, soon after leaving Kincardine. The propeller was running on time, upon the usual course, and at her ordinary speed of about 10 miles per hour. About 2 o'clock P. M. "a very wet, dense, heavy fog" came up, which shut out from view all landmarks and natural objects. The propeller continued on her course at her ordinary speed of 9 or 10 miles per hour. When she had run out his time, the mate called the master, who at once came on deck, took his position in front of the pilot-house, and sent the mate to the mast-head to ascertain if anything could be seen over the fog. The master, supposing that the propeller had cleared the point, as she had run out her time, ported the vessel so as to change her course for Southampton, but finding from the vessel's movements almost immediately afterwards that she was getting into shallow water he at once starboarded her wheel and checked down. The propeller, however, stranded upon the outer edge of Nine-Mile Point, eight or nine miles from the harbor of Southampton. If she had run one or two minutes more on her original course, or if she had run 100 feet further to the north and east before porting her wheel, the point would have been cleared, and the stranding would not have occurred. When he came upon deck, at the call of the mate, the master did not examine his compass to ascertain the exact course of the vessel. The stranding was caused by his porting a minute too soon, and occurred about 2:30 P. M., while the dense fog was still prevailing and obscuring all landmarks. After stranding, efforts were made to back her off, but without success. Then her anchor was put out, and the attempt made to work her bow out into the lake by the use of the windlass. While these efforts were being made the clerk of the boat was sent ashore to telegraph to Sarnia for the assistance of a tug to pull the vessel off. She could have been readily and easily pulled off by a good tug, without lightering her, as she was only aground at or on her heel. In her efforts to release herself, the Ontario broke her wheel and shoe. This was the only damage she sustained directly from the stranding and the efforts to get her off. The cargo was in no respect injured or damaged by the stranding, or the attempts to release the vessel. While the vessel was being gradually worked off by

the use of her anchor and windlass, and about four hours after the strand-
ing, the wind, which had been from the southward and light when she
grounded, changed to the northwest, commenced blowing hard, and the sea
began to rise, indicating the approach of a severe storm. The heavy sea
prevented all further efforts to get the vessel off by means of the anchor and
windlass. The storm continued to increase in force and violence, and
became so severe that the lady passengers and children' were put ashore
in the early part of the night. About 10 o'clock at night, the storm con-
tinuing to increase in violence, and the wind coming from the lake, the
vessel commenced pounding, and was in imminént danger of being driven
onto the shore and becoming a total wreck. To avoid this threatened
and impending danger, the master, after consulting with his officers,
opened the sea cocks, and scuttled the propeller. As the result of this
scuttling portions of the cargo were greatly damaged, but the vessel her-
self and the remainder of the cargo were saved. The storm continued
throughout the night of the 12th of October, and at daylight on the 13th
(Sunday) it was still so severe and threatening that all the passengers
were landed. It continued during Sunday. Sunday night it blew so
hard that the officers and crew abandoned the vessel, expecting she would
become a total wreck before morning; but on Monday morning, the storm
having abated somewhat, the officers and crew returned to the boat. The
storm was so violent, and the sea so heavy, that the wrecking tugs with
steam pumps could not reach the Ontario until Monday afternoon.
Agents of all or most of the underwriters except respondent came with
the tugs, and took charge of the operations of getting the propeller off,
which was accomplished on Tuesday, the 15th of October, and done
without special difficulty after she was pumped out. She was towed
with her cargo to Sarnia, where the underwriters in charge unloaded and
disposed of the damaged portions of the cargo, and where the vessel was
repaired. The matter of adjusting the loss was referred to a skilled ad-
juster of Toronto, most of the underwriters expressly consenting to the
appointment and selection of said adjuster. Respondent's general agents
were informed of his appointment, knew that he was proceeding to make
the adjustment on the basis of general average contribution, and when
the adjustment was completed were notified of the result thereof, and
made no objection to the proceeding or to the award. All the under-
writers on the vessel, except respondent, paid their respective propor-
tions of the general average loss charged against the Ontario under and
according to the adjustment.

The respondent refusing to recognize its liability for any portion of the
loss sustained by the Ontario, under the general average insured against,
in, and by its said policy, the libelant filed its libel to recover of respond-
ent its proper proportion of said general average loss. Several defenses to
the suit are set up by respondent in its answer; the one ultimately mainly
relied on, however, being that there was a want of ordinary care and skill
in the navigation of the Ontario at the time the stranding occurred, and
that such stranding was the direct or chief cause of the loss, thereby ex-
empting respondent from all liability therefor under the exception con-

tained in the policy. On the first submission of the case the learned district judge adjudged and decreed that libelant was entitled to recover its damages for the loss set forth in the libel, and for the purpose of ascertaining the amount thereof a reference was made to a commissioner to take proofs and report the sum due libelant for such damage. When the commissioner's report, which found the amount due libelant from respondent to be $3,074.22, with interest from August 27, 1887, the date of filing the libel, after disallowing the item $376.28 for new wheel and shoe for the propeller, and other items for telegraphing, wages and board of crew, use and damage to hawser, and services of tugs and lighters in pulling off the Ontario, came before the court for final action thereon, both sides having reserved general exceptions thereto, the respondent asked a reconsideration of the question of its liability under the terms and provisions of its policy. Such reconsideration was had, and the court reached the conclusion that the master was guilty of gross negligence in approaching the land, and in endeavoring to enter the harbor of Southampton at the speed of 9 or 10 miles per hour, in a very wet, dense, and heavy fog, as thick as ever occurred on Lake Huron, and that, if the loss had been total, libelant would not have been entitled to recover by reason of the exception in the policy exonerating the insurer from liability for all perils, losses, misfortunes, and expenses arising from the incompetency of the master or the insufficiency of the crew, or want of ordinary care and skill in navigating the vessel. The libel was accordingly dismissed, with costs. The reasons given in support of the conclusions reached by the court below are fully and clearly stated in the opinion of the learned district judge, reported in 37 Fed. Rep. 220.

Libelant seeks by its appeal a reversal of the decree dismissing the libel, and a recovery against respondent for its proportion of the general average loss arising from the scuttling of the vessel. The right of the district court, when the case came on for hearing upon exceptions to the report of the commissioner, to reconsider and reverse its decision as to respondent's liability, made when the reference was ordered, is not, and cannot be, questioned under the authorities. *Fourniquet* v. *Perkins*, 16 How. 84; *Green* v. *Fisk*, 103 U. S. 518. Neither is the correctness of the amount apportioned and charged against respondent by the report of the commissioner controverted by either side. But the two questions raised and discussed before this court are those on which the district court rested its decision, viz.: *First*, was there a want of ordinary care and skill in navigating the Ontario which led to her stranding? and, *second*, was such stranding, in a legal sense, the proximate cause of scuttling the vessel so as to defeat libelant's right to recover the general average loss sustained thereby?

It is settled by the authorities that stranding is a peril of the sea and lakes, and that a policy of insurance against perils of the lakes covers a loss by stranding, although arising from the negligence of the master or crew, in the absence of an express exception to the contrary, for the reason that the insurer undertakes to indemnify the assured against losses from particular risks, without any implied undertaking on the part of

the assured that his agents shall use due care to avoid them. ·*Insurance Co.* v. *Sherwood*, 14 How. 351–365; *Insurance Co.* v. *Adams*, 123 U. S. 67, 73, 8 Sup. Ct. Rep. 68; *Steam Co.* v. *Insurance Co.*, 129 U. S. 438, 9 Sup. Ct. Rep. 469; and *Copeland* v. *Insurance Co.*, 2 Metc. 432, 448, 450. The policy in the present case contained such an express exception against negligent navigation, but the fact of stranding does not in and of itself raise a presumption or create any legal inference that it resulted from a want of ordinary care and skill in navigating the vessel so as to bring it within the operation of the exception. The stranding being a peril covered by the general terms of the policy, it raised a *prima facie* case of liability against respondent for such losses thence arising as came within the provisions of the policy, and it devolves upon the respondent to show that such stranding was consequent upon, arose from, or was caused by, the negligent navigation of the vessel. The rule laid down in *Transportation Co.* v. *Downer*, 11 Wall. 129, seems to me to impose this burden upon the respondent. But it is not very material upon which side rests the burden of proof of showing whether there was or was not a want of ordinary care and skill in navigating the vessel, as there is little, or no controversy or conflict touching the facts bearing upon the question. No incompetency of the master or mate, nor insufficiency of the crew, is either claimed or established. The respondent vests its claim of a want of ordinary care and skill in navigating the Ontario mainly, if not solely, upon the fact that the vessel maintained her speed at the rate of 9 or 10 miles per hour in a very wet, dense, and heavy fog. This is the distinct act of negligence charged against the vessel, and relied on as the cause of her stranding. Bearing upon this alleged improper rate of speed, counsel for respondent calls attention to the thirteenth article of a Canadian statute entitled "An act to make further provision respecting the navigation of Canadian waters, assented to May 7th, 1880," which provides that "every ship, whether a sailing ship or steam-ship, shall, in a fog or falling snow, go at a moderate speed." By another section the non-observance of the rules provided by the act is deemed a willful default by the person in charge of the vessel at the time, rendering him liable for any damage to person or property thence resulting. This Canadian law was neither pleaded nor proved. It is therefore doubtful whether this court can properly take notice of it; the rule being "that the courts of one country cannot take cognizance of the law of another without plea and proof." *Steam Co.* v. *Insurance Co.*, 129 U. S. 445, 9 Sup. Ct. Rep. 469, and cases cited. But there is no occasion for looking to or considering this Canadian act, as the twenty-first rule of our own navigation statute (section 4233, Rev. St.) provides that "every steam-vessel shall, when in a fog, go at a moderate speed." The purpose of this requirement, as stated in the case of *The Pennsylvania*, 19 Wall. 133, 134, was to guard against danger of collisions. What is "a moderate speed" can hardly be precisely defined; it must depend upon the circumstances of each case. In *The Portsmouth*, 9 Wall. 682, the vessel's speed of 8 or 9 miles an hour in a fog was considered excessive. Other cases are to the same effect. I accordingly concur with the district judge in the conclusion that the Ontario

was at fault in maintaining a speed of 9 or 10 miles an hour in the dense fog then prevailing. Regarding the vessel's speed as being immoderate, and as constituting negligent navigation under the circumstances, the question still remains whether this fault contributed to the stranding,— that is, whether the vessel's improper speed was in any proper sense the cause of such stranding. If her speed, however immoderate or excessive, did not contribute to the disaster, or had nothing to do with bringing it about, it cannot be charged against the vessel so as to be of any avail to respondent. In *The Farragut*, 10 Wall. 334, 339, the absence of a special lookout was charged as a fault. The court said: "It is perfectly evident that the absence of a special lookout had nothing at all to do with the happening of the accident, and therefore it can have nothing to do with fixing the liability of the parties." This principle has been repeatedly recognized and announced. Applying it to the present case, I am unable, after a careful examination of the facts and circumstances preceding and attending the stranding, to see that the vessel's speed, whether moderate or immoderate, had any connection whatever with her stranding, or in any way contributed to that disaster. Her rate of speed would, undoubtedly, have its bearing upon the force with which she would strike in running upon shoals. It would thus affect the question as to the ease or difficulty of getting the vessel off, and would be calculated to produce greater or less injury in the event of striking, according to whether she was moving fast or slow. But these are effects or incidental results of the stranding, and throw little or no light upon the material question, whether the stranding was caused by the vessel's improper speed. Libelant seeks no recovery for, nor does the policy cover, the partial injury to the Ontario sustained as the direct or immediate result of the stranding.

Several captains of large experience and familiarity with the subject testify that it was the general usage and custom of Canadian vessels navigating this route to run on time, and maintain this ordinary speed, notwithstanding the prevalence of fog, and that aside from the danger of collision with other craft this was the safer course to pursue until within a short distance, say a mile or half mile, from the "Dummy," at or near the entrance to Southampton harbor. This "Dummy" was four or five miles beyond the point at which the Ontario stranded. The reason assigned by said witnesses for the statement that it is safer to run on time at ordinary speed than to check up in a fog, is that this course affords a better reckoning as to the place and position of vessel, and location of landmarks. It is not shown that this general usage and custom was known to respondent; nor can it be relied on to justify a rate of speed forbidden by law. While this is so we may, however, look to the facts and circumstances attending the vessel's running on time to ascertain what contributory connection, if any, existed between the speed maintained and the stranding. On running the regular course on time from Kincardine to the place of stranding, a distance of 20 miles, there was little or no deviation. Having run out her time and in a proper direction, the master, supposing that the vessel had passed Nine-Mile Point, and that the proper position had consequently been reached for chang-

ing her course in the direction to make Southampton harbor, ported the vessel's wheel one or two minutes too soon.   If she had gone a hundred feet further on her course, N. E. by N., before porting, the point of stranding would, as the master supposed it was, have been cleared.   It thus appears that the vessel in running on time fell only one or two minutes short of passing the shoal on which she struck.   A fraction more of speed, or a delay of two minutes in porting her wheel, would have prevented the stranding.   How can it be said that the vessel's improper or excessive rate of speed either caused or contributed to the disaster under such circumstances?   The mistake of the master in porting a trifle too soon was not due to the vessel's immoderate speed.   Ordinary care and skill did not require the Ontario to stop when she encountered the fog, and wait until it should clear up.   No law imposed such a requirement. She had the right to keep moving, provided she maintained her proper course.   Having run out her time at a known speed, whether moderate or immoderate, the master fairly and reasonably assumed that the vessel had reached the position on her voyage where, in the course of proper navigation, her wheel should be ported.   He was mistaken, ported too soon, and grounded.   But what had the vessel's improper rate of speed to do with that mistake, or in bringing it about?   I am unable to see any connection whatever.   It has not been claimed that the master's act in porting the vessel's wheel one or two minutes too soon was, under the circumstances, a want of ordinary care and skill in navigating the vessel.   Tested by the authorities the master's mistake which led to the stranding was not negligent.   In *Brown* v. *Lynn*, 31 Pa. St. 513, it is said that "ordinary care, skill, and diligence is such a degree of care, skill, and diligence as men of ordinary prudence under similar circumstances usually employ."   In the *Nitro-Glycerine Case*, 15 Wall. 524, the supreme court say that "the rule deducible from them [the authorities] is that the measure of care against accident, which one must take to avoid responsibility, is that which a person of ordinary prudence and caution would use if his own interests were to be affected, and the whole risk were his own."   The court in that case, after adopting the definition of negligence as the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do, further say that "it [negligence] must be determined in all cases by reference to the situation and knowledge of the parties, and all the attendant circumstances."   No proof is introduced to show that the act of the master in porting the vessel's wheel when he did, and which carried her aground, was, under the circumstances, either negligence or bad seamanship.   My conclusions on the first branch of the case are that, while the vessel was at fault in maintaining too high a rate of speed in the fog, such fault or want of proper navigation neither caused nor contributed to the stranding; and that the mistake of the master in porting too soon, which did cause the stranding, was not such want of ordinary care and skill in navigating the vessel as brought it within the exception of the policy.

But suppose it be conceded that the stranding resulted from such want of care and skill in navigating the vessel as came within the exception of the policy, does it follow that libelant's right to recover for the general average loss arising from the subsequent voluntary scuttling thereof, whereby a portion of the cargo was damaged, is thereby defeated? The determination of this question depends upon the point whether the voluntary scuttling can properly be treated or regarded as the immediate or proximate result or consequence of such negligent stranding; in other words, whether such stranding was the proximate cause of the scuttling. The learned district judge reached the conclusion, on which the libel was dismissed, that the storm which occasioned the scuttling of the vessel "was such a consequence of the stranding as might have been reasonably anticipated, and ought not to be considered as a distinct, independent cause of the voluntary scuttling."

After a careful examination of the facts of this case, and of the authorities bearing upon the subject, I am unable to concur in this opinion and conclusion of the district judge. In cases where two causes of loss concur it is often a matter of considerable difficulty to correctly apply the well-settled maxim, "*Proxima causa non remota spectatur*," and determine which is to be regarded as the efficient predominating and which the remote cause of such loss. While recognizing the rule of looking only to the proximate or predominating cause of loss, the courts have differed in its application, and the decisions on the subject are in many cases not easily reconciled. The particular facts and circumstances of each case have largely controlled and determined the application of the settled maxim. In the present case the stranding of the vessel, though negligently done, did not operate to suspend the policy as to other and distinct perils covered by its terms. While the stranding continued the policy was in full force and operation for the assured's protection as to any and all other perils of the lakes against which the insurers undertook to indemnify libelant. The fact that storms, with attendant heavy seas, might be reasonably anticipated, did not operate to take the perils thence arising out of the operation of the policy. No such effect is to be given to the words of the exception exempting the insurer from liability for damages consequent upon, caused by, or arising from want of ordinary care and skill in navigating the vessel. These words are the words of the insurer, and not those of the assured. This exception is in no sense a warranty on the part of the assured against negligent navigation, which affects the policy generally, or its continuance as to risks not directly connected with or resulting from such negligence. The legal effect and operation of the exception is merely to take a particular risk and resulting damage out of the policy, which, but for the exception, would be comprehended in the contract in the event of total loss or general average. Stranding was a peril of the lakes, covered by the general terms of the policy. A total loss of the vessel, or a general average loss thence arising, would raise a case of *prima facie* liability against the insurer. The whole scope and purpose of said exception was to exonerate the respondent from liability from all perils, losses, misfortunes, expenses, or dam-

ages consequent upon, arising from, or caused by a "want of ordinary care and skill in navigating said vessel." It has no bearing upon risks and damages covered by the policy, which cannot properly be considered as consequent upon, arising from, or caused by such want of ordinary care and skill in the vessel's navigation. *Yeaton* v. *Fry*, 5 Cranch, 335. What perils, losses, misfortunes, expenses, or damages can properly be regarded as consequent upon, arising from, or caused by the alleged negligent stranding of the vessel? They are manifestly limited to such and such only as are the direct, immediate, or proximate consequence or result of such stranding, and do not extend to the remote consequences thereof. This limitation upon the term of the exception is sanctioned by the case of *Insurance Co.* v. *Adams*, 123 U. S. 67, 74, 8 Sup. Ct. Rep. 68, where the policy contained the provision that the insurer should not be liable for loss occasioned by "the derangement or breaking of the engine or machinery, or any consequences resulting therefrom." It was held that this exception related "to losses of which the derangement or breaking is the proximate cause, and not to such as are a remote consequence of either." No injury whatever resulted to the Ontario's cargo as the direct or proximate consequence of her negligent navigation or her stranding as an accomplished act, nor did the vessel herself sustain any material or recoverable damage therefrom. The stranding did not directly endanger or imperil either the vessel or her cargo. It temporarily delayed her voyage, and while thus delayed another peril arises in the shape of a severe storm of force and violence, and attended with such heavy seas as to make it probable that the vessel would be driven ashore and become a total wreck, to avoid which threatened and imminent danger she was voluntarily scuttled. Can it be maintained that this storm, which arose four or five hours after the stranding was an accomplished fact, and which necessitated the scuttling of the vessel, was in any proper sense the immediate or proximate consequence of the stranding, or that it arose from or was caused by such stranding, or the alleged negligent navigation of the vessel? No case has been cited, nor has my own investigation resulted in finding any authority, which sustains or sanctions such a proposition. The stranding, even though occasioned by want of ordinary care and skill in navigating the vessel, certainly did not set in motion or give rise to the storm which rendered the scuttling necessary, thereby causing damage to a portion of the cargo, and giving rise to the general average loss for which recovery is sought. The storm with its proximate consequences and results was an independent peril against which the insurer undertook to indemnify the assured. In what sense was such storm, or the voluntary scuttling made necessary therefrom, a peril consequent upon, arising from, or caused by want of ordinary care and skill in navigating the vessel or in negligently stranding her?

The stranding, on the theory of the defense, was not only the effect of the want of proper care and skill in navigating the vessel, but such effect was the efficient predominating cause of subsequent loss from a peril of the lakes wholly distinct and independent of the peril incurred in

stranding. It is urged in behalf of respondent that the stranding should be regarded as the proximate or efficient cause of the disaster which befell the vessel, because such stranding never ceased to operate until the loss was complete,—because it created the necessity for the scuttling,—and should therefore be treated and considered as the *causa causans* of the loss, for the reason that if the vessel had not been stranded she would probably have sustained no injury from the storm, or would not have been compelled to resort to scuttling as a means of safety. This claim and position of respondent, which seems to me to confuse mere antecedent wants and conditions with efficient causation, does not settle, but merely presents, the vital question, which is this: Was the negligent navigation or stranding of the vessel the predominating or proximate cause of the loss arising from the voluntary scuttling of the same, or was the storm the immediate, distinct, and proximate cause of such scuttling, and the loss thence resulting? The storm which arose after the stranding was of such force and violence, and from such direction, as to drive the vessel from her position further ashore, and render it highly probable, if not absolutely certain, that she would become a total wreck. In the presence of this new impending peril and danger the master, after consultation with the other officers, voluntarily scuttled the vessel in order to save her and the cargo from destruction. I fail to see any causal connection between the stranding and this subsequent scuttling of the vessel under such circumstances. Suppose the vessel had been insured against loss or damage by fire or lightning, with the same exception as contained in the present policy against perils and losses arising from or consequent upon want of ordinary care and skill in navigating the vessel, and she had been struck by lightning or burned by fire communicated from the shore while stranded, it would not admit of a moment's debate that the insurer would be bound to make good the loss sustained, even though the stranding occurred through negligent navigation. No court would seriously entertain the proposition as a defense for the insurer, that if the vessel had not been in that particular place she would not have been exposed to the fire, or would not probably have been struck by lightning. So in the present case, unless it can be successfully maintained that the storm and the necessity thence resulting for scuttling the vessel was the immediate or proximate consequence of the stranding, or directly arose from, or was caused by, such stranding, then such storm as an independent peril covered by the policy must stand upon the same footing as fire or lightning in the case supposed. A correct application of the doctrine of proximate and remote cause establishes, in my opinion, the proposition that the storm rather than the stranding should be considered the predominating efficient cause, and the loss resulting from the voluntary scuttling of the vessel.

Where there is a loss from the operation of two concurring or co-operating agencies or instrumentalities, this character, connection, and effect may be such that the one nearest in point of time to the accident or disaster should not be regarded as the predominating efficient cause of the loss. That it is said in the case of *Dole* v. *Insurance Co.*, 2 Cliff. 431:

"The rule is that where different causes concur, to one of which it is necessary to attribute the loss, it is to be attributed to the efficient predominating peril, whether it is or not in activity at the consummation of the disaster;" and the learned district judge, after referring to the cases of *Peters* v. *Insurance Co.*, 14 Pet. 99, 100, and *Insurance Co.* v. *Sherwood*, 14 How. 351, correctly states that by the proximate cause of loss is to be understood, not necessarily that cause which instantly precedes or accompanies the loss in point of time, but the dominant cause,—the cause but for which the loss would not have occurred, and between which and the loss no other distinct cause intervened. The general rule, however, is that when the contributory causes are independent of each other the nearest is of course to be charged with the disaster. Thus in *Insurance Co.* v. *Boon*, 95 U. S. 130, it is said: "The proximate cause is the efficient cause,—the one that necessarily sets the other causes in operation. The causes that are merely incidental or instrumental of a superior or controlling agency are not the proximate causes and responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is of course to be charged with the disaster." In that case the policy exempted the insurer from liability for any loss or damage by fire which might happen by means of any invasion, insurrection, riot, or civil commotion, or of any military or usurped power. An armed force of Confederates during the civil war attacked the city in which the insured property was located. The Federal officers in command, finding it could not be successfully defended, and in order to prevent the military stores from falling into the hands of the rebel troops, set fire to the town hall in which such supplies were deposited. The fire, without other interference or agency, spread to the adjacent building, thence through two other buildings to the store containing the insured goods, which were destroyed. It was held that the fire happened by means of invasion and the proper exercise of military power, and came within the exception of the policy, on the ground that the burning of the city hall and the continuing spread of the fire could not be regarded as a new and independent cause of loss. Firing the hall was a necessary incident and consequence of the hostile rebel attack upon the city,—a military necessity caused by the attack,—and having been started the fire continued till it reached and destroyed the goods insured. When the conclusion was reached that the fire was brought into being by invasion or usurped military power, or that no new or independent agency intervened in spreading it, the result logically followed that the risk or loss came within the exception. In the present case the storm which created the necessity for scuttling the vessel was in no sense set in operation by the stranding, but was a distinct, independent, and intervening cause, nearest to and therefore properly chargeable with the disaster. I am wholly at a loss to understand how the scuttling of the vessel to save it from the danger of the new and independent peril of the storm can be considered as a mere incident of the stranding as the superior or controlling agency. The stranding would itself have occasioned no loss, except perhaps a slight injury to the ves-

sel's wheel and shoe, which the policy did not cover. Upon what principle can it be declared the dominant or proximate cause of the loss resulting from the subsequent scuttling rendered necessary by the distinct, disconnected, and independent agency and instrumentality of the storm? Certainly the scuttling was not the result of the continued influence or effect of the stranding, nor was it the natural and probable consequence of the alleged want of ordinary care and skill in navigating the vessel. In *Railroad Co.* v. *Kellogg*, 94 U. S. 475, it is said: "But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it. The inquiry must, therefore, always be whether these was any intermediate cause, disconnected from the primary fault and self-operating, which produced the injury." Here there was disconnected from the stranding an intermediate, independent, self-operating cause, which was sufficient of itself to produce, and which did produce, the loss sought to be recovered. In *Insurance Co.* v. *Transportation Co.*, 12 Wall. 194–199, it is said: "There is undoubtedly difficulty, in many cases, attending the application of the maxim '*Proxima causa non remota spectatur*,' but none when the causes succeed each other in order of time. In such cases the rule is plain. When one of several successive causes is sufficient to produce the effect, (for example, to cause a. loss,) the law will never regard an antecedent cause of that cause, or the *causa causans*. In such a case there is no doubt which cause is the proximate one within the meaning of the maxim." In that case it was urged on behalf of the insurance company that, as the assured had taken the risk of collision, and as the collision caused the fire, it was not liable. The court, however, while conceding that the assured had taken the risk of collision, and that the collision caused the fire, said: "But it is well settled that, when an efficient cause nearest the loss is a peril expressly insured against, the insurer is not to be relieved from responsibility by his showing that the property was brought within that peril by a cause not mentioned in the contract." The present case falls within the rule thus laid down by the supreme court, for if the stranding be considered as one of the contributing causes of the loss it was succeeded by another, sufficient to produce the disaster, and such succeeding cause in order of time was a peril expressly insured against. When the facts of *Insurance Co.* v. *Transportation Co.*, 12 Wall. 194, are examined it will be seen that, in reaching the conclusion that the fire was the proximate cause of the loss sustained, the court gave a broader application to the rule than the present case calls for. In *Insurance Co.* v. *Sherwood*, 14 How. 365, 366, Mr. Justice CURTIS, speaking for the court, says that, "in applying this maxim, in looking for the proximate cause of the loss, if it be found to be a peril of the sea [covered by the policy] we inquire no further; we do not look for the cause of that peril." *Insurance Co.* v. *Tweed*, 7 Wall. 44, does not support respondent's position, for there it was assumed that no new intervening cause had occurred. But this case of *Insurance Co.* v. *Tweed* is criticized in *Scheffer* v. *Railroad Co.*, 105 U. S. 251. Speaking for the court, Mr. Justice MILLER says: "This case, (7 Wall. 44,) went to the verge of

sound doctrine in holding the explosion to be the proximate cause of the loss of the Alabama warehouse; but it rested on the ground that no other proximate cause was found." It was conceded in that case that if a new force had intervened sufficient of itself to stand as the cause of the misfortune, the other (the explosion) would be considered as too remote. Without extending quotations from decision and text writers on "Insurance," or entering upon a detailed review of the cases, I am clearly of the opinion, after careful consideration of the subject, that the authorities, American and English, support the conclusion reached by the court, that a correct application of the doctrine of proximate and remote cause to the facts of this case requires that the storm should be regarded as the, proximate or predominating efficient cause, which necessitated the scuttling of the vessel from which resulted the damage to a portion of the cargo, and gave rise to the general average loss sought to be recovered. *Insurance Co.* v. *Lawrence*, 10 Pet. 517; *Express Co.* v. *Insurance Co.*, 132 Mass. 377; Lee, Shipp. 444; 2 Arn. Ins. 800–808, 1342; Lown. Ins. 122; Hild. Ins. 269; *Cory* v. *Burr*, L. R. 8 App. Cas. 393; *Dudgeon* v. *Pembroke*, L. R. 9 Q. B. 582; same case affirmed in house of lords, L. R. 2 App. Cas. 284; *Wilson* v. *The Xantho*, L. R. 12 App. Cas. 503.

If the stranding of the vessel had resulted from negligent navigation within the exception of the policy, the master could not, under the authority of *The Portsmouth*, 9 Wall. 682, have resorted to a jettison of her cargo, or any part of it, in order to release the vessel, and then recover by way of general average contribution for such loss. But that case does not control the present, in which there was no want of ordinary care and skill in navigating the vessel which caused the stranding, nor any necessity for making a jettison of the cargo or any part of it to release the vessel or relieve her from any direct effects or proximate consequences of the stranding. The voluntary scuttling was produced by another and different cause, and his right to resort to the voluntary sacrifice under the circumstances can hardly be questioned. The cases of *Barnard* v. *Adams*, 10 How. 270, and *Fowler* v. *Rathbones*, 12 Wall. 102, fully sanction the action of the master in scuttling the vessel, and make a proper case for general average, to which the owners and insurers of the cargo have all assented. It is not material to consider whether the owners of the damaged cargo could have held the vessel or its owners liable for the injury sustained, or whether the vessel could have enforced against cargo owners a general average contribution. Respondent cannot be heard to interpose objections to the adjustment which the owners of the cargo did not choose to make. Nor are we in this case called upon to determine whether the vessel, as a common carrier and insurer of the goods except against the acts of God and the public enemies, could have been held for the damage sustained by that portion of cargo injured from the scuttling. The terms of the bills of lading, under which the cargo was being carried, are not before the court, so as to enable it to say what were the legal rights and liabilities between the vessel and cargo owners under the circumstances.

From the foregoing conclusions reached by this court it follows that

the decree of the district court dismissing the libel was erroneous and should be reversed, and that libelant is entitled to recover, and should have a decree against respondent for the sum of $3,074.22, with interest from August 27, 1887, as reported by the commissioner, together with costs in this and the district court; and it is accordingly so ordered and adjudged. .