Nott, Ch. J.,
dissenting:
,. 1. The charter party was drawn and prepared by the charterers. “ Its doubtful expressions should therefore, according to a well-known rule, be construed most strongly against the party who uses the language.” (Garrison v. United States, 7 Wall., 688.) And where such “ an instrument is susceptible of two constructions — the one working injustice and the other consistent with the right of the case — that one should be favored which- upholds the right.” (Noonan v. Bradley, 9 Wall., 374.)
2. The charter party contemplates two classes of risks, and only two, and accordingly provides that “ the war risk shall be borne by the United States; the marine risk by the owners.”
*375 3. By the use of the well-known term “ marine risk ” the charter party imports those risks which may be guarded against and covered by marine insurance.
4. There is nothing in the charter party which directly or by implication deprives either the owners or the insurers of their legal and customary right, viz, the master’s duty “ to exercise the highest prudence as well as skill to guard against loss.” (The Portsmouth, 9 Wall., 682, 684.)
5. The charter party .gave to the charterers no right to destroy the owners’ policy of insurance by interfering with the master’s discretion. Marine risk implies marine discretion. If the owners were responsible for the one they were entitled to the other.
6. The contractual right of the charterers was to withhold the vessel’s per diem compensation during the period of delay and hold the vessel responsible for losses on the cargo directly attributable to an unreasonable refusal to deliver it.
7. The contractual rights of the owners secured to them an option. They might refuse to obey the order, and disobeying, take the risk of losing the ship’s wages and having her discharged from the service, or they might take the risk of complying and injuring their vessel.
8. The action of the master in laying his vessel alongside of the transports was not the act of the owners but of the charterers as completely as if they had taken the master off his vessel and put one of their own officers in command.
9. The vis major was not the wind and the waves, but the guns of a fleet and an overwhelming military force having, in a military emergency, unlimited discretion.
10. The, emergency ivas want of water for troops, coupled with the fact that the adjacent harbors were in the possession of the enemy.
11. The responsible officer who sent the vessel nearly to destruction virtually impressed it with a resulting implied contract under United States v. Russell (13 Wall., 623). He was justified by the emergency, and correctly recognized the legal situation when he assured the master that the owners should be recompensed for inevitable injury to the vessel. *376 a point of view bis action was interfering with tbe navigation of tbe vessel and was a “ fault” “ attributable to the United States or its agents.” (Charter party, Art. IV.)
12.. The injury to the vessel was not a marine risk. It was a risk not contemplated or provided for by the charter party. But if it was contemplated by the charter party it was either a war risk, incident to the adjacent coast being under the control of the enemy, or it was “ attributable to the fault of the United Sta tes or its agents ” in forcibly compelling the master to seek inevitable disaster.
The claimant should recover for the actual expenses of repairing the vessel, and for her wages, less her running expenses, during the period of repairs.