## THE PORTSMOUTH.

1. A captain who, in the night and in a fog, enters a port, supposing it to be his port of destination, enters at his peril of its being so, unless there have been some necessity for his seeking a port. If there have been proper ground to doubt whether the port was the one which he supposed it to be, and he could safely wait outside till morning, or could signal a tug-boat to pilot him in, he should not proceed till he can see or know where he is going.

2. A loss of a part of the cargo by a jettison resorted to in order to lighten the boat after she had run aground in consequence of violating such a dictate of prudence, is not a loss "by dangers of the navigation" within the meaning of a bill of lading having an exception in those terms.

3. A vessel proceeding in the night and in a fog into port, is bound to proceed at a low rate of speed.

4. If a vessel is stranded, it is the duty of the captain to take all possible care of the cargo. If the vessel must be lightened before she can get off, he should get lighters, if possible, and land it, not make a jettison of it.

APPEAL from the Circuit Court for the Northern District of Illinois; the case was this:

The Salt Company of Onondaga shipped at Buffalo, on the propeller Portsmouth, a large quantity of salt for Chicago, under a bill of lading in the usual form, but containing an exception of the dangers of the navigation.

On the 9th of October, 1866, the propeller, with the salt on board, reached Fox Island, in Lake Michigan, and about seven o'clock in the evening of the same day left it, bound directly for Chicago, using both sail and steam. The weather was foggy, and the wind was blowing from the northeast, with a considerable sea. The fog continued during that night and all the next day, and the wind blew freshly, though not so as to prevent the propeller's carrying her foresail. Nothing particular occurred until about sunset of the evening of the 10th, when, as described by the master, the fog lifted for a minute, and a loom of the land on the west side of the lake was discovered, and the master, mate, and engineer "could just see a church-steeple and a house, as near as they could

calculate." The master did not know the distance from Fox Island to Racine, but consulting with the engineer as to the quantity of steam carried, and referring to his own expectation of the time when he expected to be that far on his course, which he had fixed at six o'clock in the evening, he concluded that the place was Racine, in Wisconsin. Acting upon that conclusion the propeller was continued on a course generally south by east half-east, and southeast, then south by west, and southwest, and finally west, until a whistle was heard, which the master took to be that of a propeller at the Chicago pier. This must have been at about three o'clock in the morning of the 11th. Soon after a white light was discovered, and this was assumed to be the Chicago light; the light at port being a white one, though not the only white one on the west coast of the lake. The sound of cars running, and of car-whistles was also heard, which the master inferred to be caused by making up trains at Chicago. Accordingly he attempted to enter the port, but when the propeller came very near the pier it was discovered not to be the pier of Chicago, and the vessel was immediately backed. It was, however, too late. She grounded and held fast. According to the testimony of the second engineer, who was in the engine-room managing the steamer, the vessel, until three minutes before his getting the bell to stop, had been running at full speed, which was between eight and nine miles an hour. The captain and first engineer—this last, until three minutes before the bell to stop was rung having been on deck with the captain—testified that they were not running so fast, that she was "under check," the captain stating that she was not running more than from three to four miles an hour. The master testified that although the weather was rough, he might safely have remained out in the lake till daylight, or might have signalled for a tug to take them in, and that he would not have gone in had he not, in common with the other officers, certainly believed that the place was Chicago. After the boat was found to be aground and fast the clerk was at once sent ashore and dispatched to Chicago for a tug. Meanwhile the

propeller remained at the place where she had taken the bottom, which proved to be Waukegan, some thirty or forty miles from Chicago, until the tug arrived late in the afternoon of the 11th. No lighter was sent for, and no efforts were made to save the cargo, but after the arrival of the tug about one thousand barrels of the salt were thrown overboard to lighten the propeller, though the wind had then subsided, and she was apparently in no danger. The next morning she was got off, and she proceeded to her port of destination, where the residue of the salt was landed. The Salt Company now filed a libel in the District Court for the Northern District of Illinois, for the salt that had been thrown overboard and was undelivered. The propeller set up that it had been lost in the perils of navigation—thrown over to save the vessel and residue—and was so a case for general average. The District Court decided otherwise, and the Circuit Court affirmed its decree. The owners of the propeller now brought the case here.

*Mr. Comstock, for the plaintiff in error. No opposing counsel.*

Mr. Justice STRONG delivered the opinion of the court.

The contract of the appellant was to deliver the two thousand barrels of salt at Chicago to the consignee named, "the dangers of lake navigation only excepted," and whether the failure to deliver was caused by the excepted dangers is now the only question. A loss by a jettison occasioned by a peril of the sea is, in ordinary cases, a loss by perils of the sea. But it is well settled that, if a jettison of a cargo, or a part of it, is rendered necessary by any fault or breach of contract of the master or owners of the vessel, the jettison must be attributed to that fault, or breach of contract, rather than to the sea peril, though that may also be present, and enter into the case.* This is a principle alike applicable to exceptions in bills of lading and in policies of insurance.† Though the peril of the sea may be nearer in time to the

---

\* Lawrence et al. *v.* Minturn, 17 Howard, 100.

† General Mutual Insurance Co. *v.* Sherwood, **14 Id. 865.**

disaster, the efficient cause, without which the peril would not have been incurred, is regarded as the proximate cause of the loss. And there is, perhaps, greater reason for applying the rule to exceptions in contracts of common carriers than to those in policies of insurance, for in general, negligence of the insured does not relieve an underwriter, while a common carrier may not, even by stipulation, relieve himself from the consequences of his own fault.*

In view of this recognized construction given to such clauses in bills of lading as " perils of the sea excepted," or, as in this case, " the dangers of lake navigation only excepted," it is plain that the appellant has shown no sufficient excuse for the failure to deliver the salt to the consignee of the libellant.

It is manifest that the master was first at fault in mistaking the land which he dimly saw on the evening of the 10th for Racine. He was, in fact, then from thirty to forty miles farther from Chicago than he supposed he was. His supposition was unwarranted by the evidence he had. He thought the place was Racine, not because of its appearance when he saw the steeple and the house. His view of those objects was very indistinct. His language is, " We could just see a church-steeple and a house, as near as we could calculate." The outline of the shore he does not pretend to have seen, or anything which, by its appearance, justified his conclusion that he was opposite Racine. His sole reasons for assuming that such was his position are to be found in his having consulted with his engineer about the quantity of steam carried, and in his own estimate of the time when he expected to reach that place. At best, therefore, his conclusion was based upon a conjecture. Considering that the voyage from Fox Island had been through a thick fog, and in a heavy sea; that the wind had not been quite steady; that the speed of the propeller had not been measured by the log, or by observations; and considering also another fact, to which the master testifies, that he did not know the

---

* Vide Propeller Niagara v. Cordes et al., 21 Howard, 29.

distance from Fox Island to Racine, it seems to us his con-
jecture that the propeller was opposite Racine at sunset of
the 10th was no reliable guide to the subsequent conduct
of the voyage. It was, however, accepted as a guide, and it
led directly to the disastrous fault afterwards committed of
mistaking Waukegan for Chicago. The master, judging
that he had steamed far enough from Racine, readily con-
cluded that the light he saw, and the whistle and running
cars he heard were at the place of his ultimate destination,
and without any careful verification of his opinion he at-
tempted to enter the port. The light he saw, it is true, was
a white light, like that at Chicago. But there were other
white lights on the west shore of the lake. Waukegan had
one. The whistle and the running cars were not peculiar-
ities at Chicago. There was enough in his situation to
awaken doubt, and to induce caution. We think that, in
his circumstances, the attempt he made to enter the port
was inexcusably rash. It was not a necessity. His duty to
the owners, and still more to the freighters, was to exercise
the highest prudence, as well as skill, to guard against loss.
According to his testimony he might safely have remained
out in the lake until morning, or he might have signalled
for a tug to take the propeller in. It was his duty to do one
or the other. He did neither. He testifies he would have
gone out into the lake and waited until daylight had he not
supposed he had found a harbor. He had no right to act
upon such a supposition, which at best was no more than a
careless conjecture. He admits, what must be evident, that
he could have seen plainer had he waited till daylight before
attempting to enter, and that he might have known the pier
was Waukegan pier. He thinks a tug could have found the
propeller had he signalled, but he neglected to signal. The
second engineer also testifies that the propeller attempted
to enter the port at her usual speed of eight and a half or
nine miles an hour, which, if the statement be correct, was
much too great. It is true, his statement varies from the
account given by the master and chief engineer; but the
chief engineer and the master were both upon deck, and

the second engineer was in immediate charge of the engine until within three minutes of the time when the signal was given to stop, and even during those three minutes the chief engineer was outside of the engine-room. The second engineer must, therefore, have best known at what rate of speed the propeller was moving. In view of all this, we have no hesitation in coming to the conclusion, that the loss sustained by the libellants is to be attributed to the fault of the carrier, and not to the excepted dangers of lake navigation.

Were it necessary, it would be easy to show that the conduct of the master *after* the vessel was stranded was entirely unjustifiable. It was his duty even then to take all possible care of the cargo. He was bound to the utmost exertion to save it. Losses arising from dangers of navigation, within the meaning of the exception in the bill of lading, are such only as happen in spite of the best human exertions, which cannot be prevented by human skill and prudence.* But in this case no effort was made to save the cargo. The salt was not thrown overboard until after the arrival of the tug. The fog had then lifted. The wind and the sea had subsided. It is evident the salt might then have been saved, if it could not have been removed before.

DECREE AFFIRMED WITH COSTS.

---

* Propeller Niagara v. Cordes et al., cited *supra*, 685.