## THE WAALHAVEN.

Circuit Court of Appeals, Second Circuit.
December 9, 1929.

No. 62.

Hunt, Hill & Betts, of New York City (John W. Crandall, George Whitefield Betts, Jr., and Edna Rapallo, all of New York City, of counsel), for appellants.

Single & Single, of New York City (Robert E. Hill, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge. The Waalhaven, a Dutch tramp, left Nordenham, Germany, on February 24, 1927, with a cargo of fertilizer, accepted from two German shippers, but all consigned to the libelant. She had between 608 and 627 tons in her bunkers, and was bound to Wilmington, N. C., and Jacksonville, Fla., with liberty to stop at Norfolk, Va., to coal. She experienced heavy weather and nearly continuous° head winds, and on March 14th found herself some 400 miles east of Cape Race with only 150 tons, and so her master advised her owners by wireless. The owners answered on the 15th, directing the ship to go to Halifax, Boston, or New York and rebunker, so as to reach Norfolk. The master meanwhile kept on, and on the 17th sent a message that he was 150 miles southeast of Cape Race, bound for St. Johns, Newfoundland. This the owners answered, directing the ship to do her utmost to reach North Sydney, Cape Breton. The master replied on the 18th that he was 90 miles off Cape Race, and that North Sydney was not open, owing to ice, but that he would be at St. Johns within 24 hours.

The ship changed her course for St. Johns on the morning of the 18th, and made that port the next morning, though she had already left the great circle 5 or 6 days before, wishing to have St. Johns as a possible port of refuge. Upon his arrival the master ordered 180 tons, enough with what he had to reach Norfolk, but on the 20th, while in the harbor, he received from the owners a message that St. Johns was too dear, and that he should "proceed direct to Louisburg," and take enough bunkers to reach Jacksonville. Apparently this changed his plan, for he took only 75 tons, and answered that he was sailing for Louisburg, though, if "ice conditions prevented," he would go as far as his bunkers allowed. He testified at the trial that he would have gone to Louisburg, if he had not received this message, which did not change his plans; but this is very doubtful, the inferences being strongly the other way. On the 21st the owners advised him that they understood Louisburg to be open in winter, and repeated that he should take enough bunkers to reach Jacksonville.

The ship left St. Johns on the 20th, and while crossing Cabot Strait met fields of ice, which were usual, if not inevitable, at that season. Through these she injured her plates, which was the cause of leaks that eventually wet and damaged the cargo. Thus arose the cause of suit at bar. At Louisburg she arrived on the 23d and took on about 300 tons, which, with what she had, would have enabled her to reach Jacksonville. No repairs were made at that port; the master and chief officer deciding, after a cursory examination, that none were necessary. They got a certificate of seaworthiness from the port warden and cleared on the same day. The ship was soon found to be aleak, and on the 26th after a conference of the officers she put in to Boston, where she arrived on the 27th and made temporary repairs.

The master and chief officer estimated the distance from Nordenham to Norfolk at 3,500

miles; Reed's Table makes it 3,655 miles; the chart of the Navy Hydrographic Office between 3,748 and 3,794 miles. The Waalhaven burned 24 tons a day, and at the higher figure of 627 tons, about which there is much doubt, had coal for 26 days' steaming, without margin. Assuming that the necessary margin was 25 per cent. for a winter voyage, she had enough for a little less than 21 days. Her average speed must therefore be about 166 miles, if the master's calculation of distance was right, 174 by Reed's Table, and about 180 by the Navy Chart.

Her log showed 10 Atlantic voyages between October, 1925, and February, 1927; 5 east bound and 5 west. Of the 5 westbound, one in 1925 was in October and November, between Antwerp and Jacksonville; one in April and May, between Rotterdam and New York; one in August, 1926, between Rotterdam and Hampton Roads; one in September and October, 1926, from Dartmouth to Baltimore, by way of Norfolk; and one in November and December, 1926, between Antwerp and Norfolk. The average day's run for all these was about 158 miles, and, if the August voyage be omitted, 155. If only the two previous voyages in October and November, and November and December, be considered, it was 137.

The libelant, among other points, argued that the Waalhaven set out with insufficient bunkers, which made her unseaworthy; that she deviated when she put in to St. Johns; that, if she did not then, at least she did when she went to Louisburg; and that the damage to her plates was the direct consequence of the ice which she met, a peril with notice of which she was charged in any event, and which her master actually knew to be likely when he left St. Johns. The claimant maintained that the bunkers were enough; that, if not, they at worst only made the ship unseaworthy, of which condition the damage was not a direct result; that it was no deviation to put in to Louisburg, because the master had had no such intention when he broke ground; that his subsequent choice of that port was reasonable, since bunkers were exorbitant at St. Johns; that, if it was not, at least it was a mistake of management, which the Harter Act (46 USCA §§ 190–195) excused, being excepted in the charters and bills of lading.

Certainly the ship was insufficiently bunkered when she broke ground. For argument, we may accept Reed's Table of the distance at 3,655, which required her speed to be 174 miles, if she was to have a margin of 25 per cent., which is not too much upon a winter voyage in the North Atlantic. She had done as well on west-bound voyages, it is true, but never upon one at this season. The average of the last four, excluding that in August, 1926, was only 155, and this included an exceptionally fortunate one in September and October of that year. March is one of the worst months, if not the worst, in the year, and it was unlikely that she would escape very heavy weather. Indeed, her coal was no more than just enough to carry her through, if she made 140 miles, slightly more than the average of the last two west-bound winter voyages.

◼ Nevertheless, we regard the damage suffered in Cabot Strait as not a proximate result of her unseaworthiness, The Malcolm Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901. She made St. Johns without mishap, though it is faintly suggested that some plates may have been started before, and at that port she had the choice of coaling for Norfolk, as her master must have originally intended, since he ordered enough coal to do so. The owners, however, gave him peremptory orders to go to Louisburg, and so brought the ship into the dangerous waters of the Strait; that was a new decision, and, while the bunker shortage was its occasion, it was in no sense its proximate cause, because the decision was not a consequence reasonably to be apprehended when the ship broke ground.

◼ Nor do we think that it was a deviation to put into St. Johns, for we see no reason to suppose that this was originally intended. Coal was $5.80 at Bremen, $4.75 at Norfolk, $6.50 in Louisburg, $11.50 in St. Johns. While there was, therefore, a motive to cut down bunkers at Nordenham, we cannot suppose that there was any intention to put in at Nova Scotia. The libelant urges, first, that the figures should be more unfavorable; second, that "gross negligence" may be enough. If we take the least favorable figures—3,794 miles for the voyage, and 137 a day for the ship—she would, indeed, have burned about 665 tons; but it by no means necessarily followed that she would encounter such bad weather as upon the two voyages from which this average daily run is figured. An average of 146 miles would have brought her through, and only two voyages had ever been below this, one by only 4 miles a day. It is incredible that she should have deliberately planned to call anywhere short of Norfolk.

Though the master was necessarily negligent, it is still true that, when he turned his course towards St. Johns, he was compelled to

do so. Had he foreseen, when he broke ground, that he must, it would, of course, be absurd to speak of his decision as involuntary; he would have deliberately arranged that his hand should be forced. The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491. If, on the other hand, he merely took a chance, there are great difficulties in treating his departure as a deviation. If we are so to charge a ship whenever she changes her route, because compelled to by events which she ought to have foreseen, The Malcolm Baxter, Jr., was wrongly decided, and every unseaworthiness which so results is a deviation. In that case the master had failed diligently to examine his ship, and his omission resulted in her being forced into a port of refuge. We cannot distinguish between structural defects and coal shortage; either is likely to cause a departure; each involves an imperfect forecast of what the elements will do. In The Caledonier, 31 F.(2d) 257, we declined to hold it a deviation when a ship, unseaworthy because of coal shortage, had to put in to the Bermudas. That decision is conclusive here. A deviation presupposes some deliberate choice at a time before stress of weather or the like compels the departure.

We do not forget that in The Willdomino the Supreme Court added that "gross negligence" might be enough; but this we understand to mean no more than that the facts may be so clear as to compel the inference that the master closed his eyes to them, and knew, though he may not have explicitly acknowledged, that he must change his route. The distinction between this and a deliberate intention seems to us very tenuous. In the case at bar we see no adequate reason to suppose anything of the kind, because, as we have said, nobody would think of bunkering in Nova Scotia at $6.50 a ton, when he could get coal at Bremen for $5.80.

■ Had the master followed his original purpose of taking enough bunkers at St. Johns to reach Jacksonville, or perhaps Norfolk, we should not, therefore, hold the ship. At that port of refuge he had the option to continue the voyage or to make still another stop, this time without excuse, for he could have got enough coal. He did not continue; on the contrary, whatever his own judgment, he cleared for Louisburg under the order of his owners, and, as this was deliberate, it was a deviation. The claimant argues that the choice was reasonable; coal was high at St. Johns and cheap at Louisburg; the ship saved some $500 or more by her stop. Phelps v. Hill, [1891] 1 Q. B. 605. The case at bar is not, however, like Phelps v. Hill, where the departure was without danger or delay to the cargo. To make Louisburg, the ship must go through the ice, and that was a danger to which she had no right to expose the shippers. Moreover, that danger was generally known, and, as the master's own wireless message betrayed, known to him personally. He advised his owners of the likelihood that ice might prevent his reaching that port, and was answered in substance that his fears were groundless. How it can be supposed that Phelps v. Hill is relevant to such a situation we do not comprehend. Upon leaving St. Johns the ship's duty was to sail direct, avoiding the ice, as was entirely practicable. To save some $500, her owners chose to expose her to a danger which turned out to be her undoing. There could be no clearer case of deviation.

Obviously this was not due to a mistake of management; it was because of the owner's command. We pass the question whether, not being seaworthy, she could invoke the Harter Act (46 USCA §§ 190–195) at all, or whether the exception could in any case excuse a deviation. Each is, indeed, well settled, but we need only decide that, whatever the master would have done, had he been left to himself, he was not free; as he testified, he had to follow his orders.

■ It is not necessary to consider the other points raised, beyond saying that the logs were clearly competent against the ship. Whether their use by the claimant was unfair is another matter. It is hard to see how testimony would have served in explanation. All European coal cannot be bad, and in any event we do not have to rely upon the two winter voyages alone. We have already refused to allow the testimony to be taken, and, indeed, as we dispose of the case, the bunker shortage plays no part in the result. We hold her for her owners' parsimony at St. Johns, regardless of her fitness when she broke ground.

Decree affirmed.