## THE GLYMONT.
## UNITED STATES v. AMERICAN TRADING CO.
### No. 360.

Circuit Court of Appeals, Second Circuit.
Aug. 1, 1933.

MANTON, Circuit Judge, dissenting.

George Z. Medalie, U. S. Atty., of New York City (Myron H. Avery, Sp. Asst. to U. S. Atty., of Washington, D. C., of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (Martin Detels and Charles W. Harvey, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

In 1919 the steamship Glymont undertook to carry a cargo of nitrate of soda from Mejillones, Chile, to Yokohama, Japan. After refueling at Honolulu in January, 1920, she proceeded on her voyage, but before arrival at her port of destination she ran out of fuel oil and had to be taken in tow by another vessel belonging to the libelant. This libel seeks to compel the respondent to pay general average for such towing services. The charter party under which the respondent's cargo was carried contained the customary provisions known as the Jason clause. The District Court denied recovery because the vessel departed from Honolulu without sufficient fuel oil to meet the contingencies to be expected on her voyage to Yokohama.

This appeal attacks chiefly the trial judge's findings of fact. He found that she left Honolulu with 2,822 barrels of fuel oil. Concededly she purchased at Honolulu 2,647.82 barrels, but how much was on hand when she arrived there is disputed. The evidence on this question was contradictory. The master said that he had on board more than 800 barrels according to his log, but the original log was not produced. The chief engineer testified that approximately 400 barrels remained when the ship arrived at Honolulu. The engineer's log, however, showed but 20 barrels. He testified that the log was wrong because it was his custom to keep some oil "up his sleeve." The vessel was deeply laden, and for this reason, though contrary to the engineer's wishes, the tanks were not completely filled at Honolulu. No record of the soundings of the tanks was preserved, and the second assistant engineer, whose duty it was to take the soundings, died before trial; hence no evidence as to the quantity of oil based on soundings was available. Hesitating to accept as correct the recollection of witnesses so long after the event, Judge Woolsey resorted to the method of determining the

618

bunker oil aboard by a comparison of the vessel's drafts at Honolulu and at Yokohama. By this method he concluded that she had only 174 barrels on arrival at Honolulu, and, adding this to what was there purchased, he obtained the figure of 2,822 barrels as the quantity with which she departed.

It is urged that in any event the vessel must have sailed with at least 3,903 barrels, because her meters indicated that she had burned that quantity between her departure from Honolulu on January 20th and noon of February 12th, when the engineer reported that only 128 barrels remained. But the master admitted that the meter readings were unreliable and that the meter might be tampered with. The respondent calls attention to one glaring error in Exhibit 16, where the meter readings for one four-hour watch show a consumption of 2,990 gallons while the readings for each of the three succeeding watches were but 990 gallons. We do not, therefore, regard the meter readings as conclusive. Admittedly the method of computation adopted by the District Judge cannot give absolute accuracy, but, even if his figure of 2,822 barrels be deemed only a rough estimate and perhaps too low, his conclusion that the vessel departed with insufficient bunkers should not be disturbed. The fact that she ran short of fuel in weather which was not so extraordinary as to account for the deficiency puts upon the libelant the burden of convincing the court that the shortage was not the result of unfitness for the voyage. See Societa Anonima Cantiero Olivo v. Federal Ins. Co., 62 F. (2d) 769, 771 (C. C. A. 2). This burden was not carried. Even if the engineer's testimony were accepted that there were approximately 400 barrels on board when the oil was purchased at Honolulu, the steamer departed with only 3,048 barrels of fuel. This was too little for a winter voyage, as will now be demonstrated.

The distance from Honolulu to Yokohama on the Rhumb line, which was the Glymont's expected course, was 3,445 miles. Distance, speed, and consumption of oil are the factors to be considered in estimating the amount of fuel necessary for a voyage. The master testified that he expected the vessel to average between 190 and 210 miles per day and that the voyage would take approximately 17 days under average conditions. The average daily consumption of oil on the vessel's prior voyages in other seas, disregarding voyages without cargo, was 150.3 barrels per day. If the average speed were 200 miles per day, and the average consumption 150 barrels per day,

the minimum requirement for the voyage would be 2,587, and if this be increased by 20 per cent. for a margin of safety, she should have carried 3,104 barrels. Elsewhere in the master's testimony he said he allowed the ship a speed of only 150 miles per day and allowed a barrel of oil for every mile of distance. On this basis she would need 3,445 barrels, assuming that she followed her course with absolute accuracy. The District Court determined that the vessel should have been regarded as a seven-knot ship on this voyage, which would mean 168 miles per day, and he accepted the engineer's estimate that her average daily consumption was 144 barrels of oil. On this basis, the voyage would take approximately 21 days and the minimum requirement of fuel would be 3,024 barrels; and the District Court held that 20 per cent. to 25 per cent. more should be added as a margin of safety.

The finding that the Glymont should be regarded as a seven-knot ship for this voyage is bitterly attacked. She had averaged nine knots from Talara to Honolulu, but on that voyage she had had favoring currents much of the way. On the voyage to Yokohama, her master knew the current would be against her part of the time and expected adverse winds. He was overoptimistic in estimating that she would average 200 miles per day. Capt. De Lien, who had made the trip numerous times, testified that she would meet a strong current and head winds, and estimated that her speed would be reduced two knots below that made on the voyage from Talara. It would serve no useful purpose to answer in detail the many criticisms directed against De Lien's testimony.

It is argued that the court disregarded the testimony as to the marine practice for determining a vessel's normal requirements for the contemplated voyage. Two expert witnesses testified for the libelant that a vessel's "normal requirements" are based on the average of her past performances, and then 15 per cent., according to one witness, and 20 per cent., according to the other, must be added as a margin of safety. Both witnesses said that conditions to be expected on the particular voyage were not to be considered, and that the normal requirements would be the same in winter as in summer. But such a practice, if it is to be supported by reason, must be based on past performances which include winter as well as summer voyages, or, at least, it must include all usual conditions of weather and extend over a considerable length of time, as the experts admitted. The Glymont had

had no experience whatever between Honolulu and Yokohama; she had had less than six months' experience in any seas. The court was well justified in considering the formula inapplicable to her, even if we assume it might be sustained in the case of vessels which had had an adequate experience over the routes between Honolulu and Yokohama. Moreover, De Lien testified that his practice on Pacific voyages was to take into consideration the wind, weather, and currents he would expect to meet in the particular voyage in contemplation, and this method of estimating requirements commends itself as being the more reasonable, and is apparently the method heretofore approved by the courts. See The Waalhaven, 36 F.(2d) 706, 708 (C. C. A. 2); The Willdomino, 300 F. 5, 13 (C. C. A. 3); Hurlbut v. Turnure, 81 F. 208 (C. C. A. 2). There was no error in the decision that at least a 20 per cent. surplus should be carried as a margin of safety and that the Glymont's normal requirements should be determined with respect to conditions to be expected on the particular voyage.

The appellants sought to establish that the Glymont met with weather of unparalleled severity, but they did not succeed. While the Glymont encountered continuous head winds, their average velocity was only 6.2 on the Beaumont scale. Although this is somewhat higher than the average velocity encountered on the voyages of other vessels listed in the Weather Bureau exhibit relied upon, it is not sufficient to explain the shortage of fuel; and the fact that the Glymont's voyage was longer than that of the other vessels means little in the absence of evidence as to the normal speed of such other vessels. The Glymont's master himself testified on direct examination that he encountered "the average weather to be expected during a voyage at that time of year; it might be a little harder than usual."

Finally it is argued that even if the vessel was insufficiently bunkered when she left Honolulu, the fault was a "default or error in navigation or in the management of the vessel" from which she was excused by the Jason clause. The voyage from Mejillones to Yokohama was undertaken in stages, for the Glymont intended to replenish her fuel at Valparaiso, Talara Bay, and Honolulu. In May v. Hamburg-Amerikanische Packetfahrt Aktien-Gesellschaft, 63 F.(2d) 248, 250, this court declared that "when a voyage is undertaken in stages, the strict requirement that a vessel be seaworthy when it breaks ground is fulfilled by equipping the vessel at each stage for the next leg of the voyage." This was not

a fuel shortage case, but The Willdomino, 300 F. 5 (C. C. A. 3), was, and is precisely in point, unless the fact that there the amount of fuel taken on at the intermediate port was determined by the owner's instruction serves to distinguish it. We do not think the writer of that opinion regarded this fact as material, nor do we. If a vessel is to have the benefit of the doctrine of voyage by stages, her duty to be seaworthy at the beginning of each stage should be as great as though the voyage were single. Whether the lack of diligence to take adequate bunkers were that of the master or of the owner's shore agents would make no difference if the voyage were single. See International Nav. Co. v. Farr & Bailey, 181 U. S. 218, 225, 21 S. Ct. 591, 45 L. Ed. 830. The rule should be the same when the voyage is by stages.

There remains the question raised by the appellee's assignment of errors regarding the disallowance of costs. We think the District Court rightly held that the question is ruled by United States v. Chemical Foundation, 272 U. S. 1, 20, 47 S. Ct. 1, 71 L. Ed. 131, and United States v. Worley, 281 U. S. 339, 344, 50 S. Ct. 291, 74 L. Ed. 887.

The decree is affirmed.

MANTON, Circuit Judge, dissents with opinion.

MANTON, Circuit Judge (dissenting).

In this libel filed for contribution in general average occasioned by the towage of the steamship Glymont into Yokohama in February, 1920, I am satisfied that the finding below is not in accordance with the credible evidence. The vessel was a tramp freighter and sailed from Boston to Valparaiso, going through the Canal, and took on cargo at Mejillones, Chile, bound for Yokohama, Japan. She took on fuel oil at Talara Bay, arriving at Honolulu January 18, 1920. Thereafter, the chief engineer sent to the master of the ship a slip showing the previous day's performance in the engine room, which included the fuel on hand. On February 12 she had on hand 128 barrels; some nitrate was burned for fuel until February 13, when a call for help was given and the West Harts arrived and towed her 255 miles to Yokohama. She had steamed in all 3,207 miles.

When the ship left Honolulu January 20, 1920, she had on board a sufficient margin of fuel oil to last the trip with weather to be expected in the crossing. The fuel oil meter read 876,360 just after the vessel's departure, and showed a consumption on February 12

of 129,930 gallons which, converted into barrels, showed she burned 3,093.6 barrels after leaving Honolulu up to noon February 12th. The entries of the oil burned verify this. The finding of the court below show she had on board 2,822.14 barrels which was 419.46 barrels less than she actually burned. As the court found, translated into steaming at the rate of 144 barrels a day, this means that she ran out of fuel three days before she actually stopped steaming on February 12th. The time which elapsed from her departure from Honolulu to February 12th was 21¾ days; one day is omitted for crossing the 180th meridian. The master asserted that when he left Honolulu he had 3,400 barrels of fuel oil, and the records of the ship justify this claim. The expert testimony of men of long experience, who knew the practice followed, say that she had on board sufficient for the voyage across the North or South Pacific. The ship's records show that there was a remarkable uniformity shown in the number of nautical miles obtained out of a barrel of fuel oil burned, to wit, 1.57. The surplus over a normal performance carried by this ship is shown to have been much higher than that shown by the experts. The ship burned 3,241 barrels and normally made 1.57 miles per barrel. She had a surplus of nearly 40 per cent. over the normal anticipated requirements. The actual passage was 3,462 miles.

But she met unusually severe weather on this voyage, as is shown by the log entries, the damage to the ship, and the testimony of the officers. It accounts for the large consumption of fuel oil. The draft tests applied by the court below were not sufficiently accurate to overcome the positive testimony and records of the ship showing the consumption of barrels of oil. It did not take into account the weather encountered and the consequent rough passage. The finding is against the evidence, and the decree should be reversed.

I dissent.