**COOPER et al. v. PINEDO.**

**THE ZESTA.**

**No. 14580.**

United States Court of Appeals Fifth Circuit.

April 15, 1954.

138

Cody Fowler, Walter Humkey, Miami,
Fla., Fowler, White, Gillen, Yancey &
Humkey, Tampa, Fla., of counsel, for
appellant.

Douglas D. Batchelor, David W. Dy-
er, Miami, Fla., advocates, Smathers,

Thompson, Maxwell & Dyer, Miami, Fla., proctors, for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

RIVES, Circuit Judge.

This admiralty libel *in rem* was brought by the sub-charterers of the M/V "Zesta" against its owners to recover damages to a cargo of bananas, it being alleged that the loss resulted by reason of the vessel's unseaworthiness, her unfitness to carry the cargo, and the negligence of her master and crew.[1] At the trial it was agreed that the issue of liability should be governed by the terms of the original charter party, which consisted of a printed form with inserted typewritten provisions for delivery of the vessel "in a seaworthy condition, * * * the refrigeration to be in perfect mechanical working condition, able to keep temperatures as directed by Charterers", and further stating "that the vessel is not responsible for damages to cargo resulting from any other causes but the actual negligence on the part of the crew." The printed portion of the charter party form also contained the "U. S. A. Clause Paramount", which provided that "This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein," and, "If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further."

Libelants engaged the services of the Zesta subject to the aforementioned terms and conditions in October, 1951, for the purpose of picking up a specified quantity of bananas at Santa Marta, Colombia, and transporting them to Miami, Florida. Before the vessel left Miami, libelants instructed the Captain via letter to pre-cool the holds by turning on the vessel's refrigeration equipment twenty-four hours prior to loading, and directed that hold temperatures should be maintained at from 54 to 56 degrees Fahrenheit during the voyage.

The bananas were purchased through a cooperative marketing association at Santa Marta, by means of a letter of credit covering the desired price for a specific number of banana stems. The letter of credit covering this particular cargo called for 6,000 stems, but in order to allow for rejection of any bad fruit, the purchasing agent of the association published a cutting order to the local farmers specifying 6,480 stems "three quarters full".[2] Approximately 7,150 stems were cut and delivered to the dock, the overage being due to the cutting of more fruit by the farmers than was called for in the order, since each farmer hoped his excess fruit would be accepted in lieu of other fruit rejected. This situation necessitated a very strict selection of the fruit for shipment, and though it is claimed that the fruit loaded was overripe and the trial court made no specific finding in this regard, the proof is practically conclusive that the bananas selected for the cargo were in good condition when delivered.

The Zesta reached Santa Marta at approximately 1:50 A. M. on Tuesday, October 23. The vessel's log reveals that engine trouble occurred during the voyage, which lasted for several hours, during which time the ship was without power and drifting. Though the normal time required for pre-cooling the holds on the vessel was from 15 to 18 hours, on this particular voyage the refrigeration equipment was started about 61 to 62 hours before the estimated time of

1. The Pan American Shipping Corporation, original charterer of the vessel, was initially impleaded by respondents, but was dismissed at the trial by agreement of the parties and order of the court.

2. The testimony shows that the banana stems for ocean shipment were cut at varying degrees of development, depending on the distance they were to be shipped, and that "three quarters full" was the usual and proper grade for shipment from Santa Marta, Colombia, to Miami, Florida.

arrival and about a day and a half in advance of libelants' requested pre-cooling period. For effective operation the system required a chemical cooling compound called freon, it being necessary to add from 30 to 40 pounds of this freon for each voyage, and there is no direct testimony that it was added for this particular trip. There is further testimony that the Zesta was a former Naval vessel with refrigeration equipment originally designed for the carriage of frozen foods; that the ship was bought from the Navy and converted in 1947 for use in the banana-carrying trade; that the refrigeration equipment was not new, and that temperature control was not fully automatic, but was to some extent regulated manually; that hold temperatures were supposed to be recorded accurately on charts, but that the recording machine was defective and, according to testimony of the Zesta's Captain, known to stick "nearly every trip", so as to record the same temperature for several hours or until it became unstuck, which defect in operation caused the recording of temperatures different from the actual temperature of the hold. The only evidence by respondent of due diligence to make the vessel seaworthy was testimony that it was in dry dock a month or longer prior to this particular voyage, but there is no showing as to the exact date of any inspection or overhaul and as to what repairs were then made; and, although respondent's mechanic, Waller, testified that he checked the refrigeration equipment at that time, he did not testify positively that he checked it before this particular voyage.

The banana cargo was loaded aboard the Zesta by 5:30 P. M. on Tuesday, October 23, and the vessel departed from Santa Marta for Miami at 6:00 P. M. During the loading there were many complaints to the ship's officers that temperatures in the holds were too high for safe transportation of the fruit.[3] While normally the hold temperatures should have reached the desired 54–56 degrees within 36 hours after the holds were closed and the ship sailed, according to the vessel's own temperature charts the No. 1 hold did not reach this temperature until about 96 hours after departure, No. 2 hold was lowered to 56 degrees some 72 hours after leaving, and No. 3 hold reached 55 degrees about 94 hours after leaving Santa Marta, and only one day before the vessel's arrival in Miami at 3:00 P. M. on October 28.

Commitments for sale of the vessel's entire banana cargo had been made prior to its arrival, but subject to delivery of the fruit in good condition. However, when the hatch covers were removed in Miami the fruit in Holds No. 1 and No. 2 were in a ripened condition and unmarketable, while the fruit in Hold No. 3 was chilled and could not be sold. The cargo was rejected by the purchaser's agents as unmarketable,[4] so that it became necessary to sell the fruit that could be salvaged at a much lower price locally. The contract price which the fruit would have brought had it been in good condition was $15,718.00, while the amount actually received for it in its damaged condition, less necessary allowances was $2,335.83, thereby revealing damages to libelants in the amount of $13,382.17.

The District Court, on the basis of the depositions and oral testimony, found (1) that, "On the particular voyage involved herein, respondent vessel was a private carrier", and "The parties could, therefore, unrestrictedly contract"; (2) that "The typewritten provision in the original time charter entered into between Claimant and Pan American Shipping Corporation was controlling as to the liability for damages to the cargo"; (3) that "The burden of proof was upon

---

3. Rafael Campo Mendoza, Chief Stevedore in charge of the loading operations, testified that he told the Mate "that the holds did not have the necessary refrigeration for the cargo."

4. Again the trial court made no specific finding as to the condition of the fruit upon arrival, but we think its unmarketable condition is fairly revealed by the testimony.

libelants to prove damages to the cargo resulting from actual negligence on the part of the crew, and libelants failed to carry this burden"; and, (4) "Since libelants have failed to prove that vessel's crew was negligent, and since the claimant and crew used due diligence in providing a seaworthy vessel, the libel should be dismissed at the cost of libelants."

On this appeal libelants strenuously insist that, under all the provisions of the charter party, the court erroneously misplaced the burden of proof in requiring libelants, as a condition to their recovery, to prove actual negligence on the part of the crew; that, even though respondent contracted as a private carrier, under the charter it had, in effect, assumed the obligations of a common carrier, so as to place upon it the burden of proving the seaworthy condition of the ship and its refrigeration equipment; that the court placed undue emphasis upon the typewritten provision exempting respondent from liability for damage to the cargo except for actual negligence of the crew, because this provision was not controlling insofar as inconsistent with the other provisions of the charter agreement, and particularly the other typewritten provision and the "U. S. A. Clause Paramount"; and, finally, that under the evidence adduced libelants were entitled to prevail, either on the theory that the vessel was unseaworthy, or that due diligence had not been used to make it so.

Respondent contends that, no question as to breach of warranty of seaworthiness having been presented below, this issue may not be raised upon this appeal; that, since libelants were sub-charterers, there is no privity of contract between them and the vessel and no express or implied warranty of seaworthiness running to them, such as

would entitle them to maintain an action for its breach; that, under the theory on which the case was tried, the District Court correctly held that the second typewritten clause was controlling over the printed "U. S. A. Clause Paramount", and that under that provision respondent assumed liability only for damage to cargo resulting from the actual negligence of the crew; that even if the "U. S. A. Clause Paramount" and the Carriage of Goods by Sea Act referred to therein were applicable, the District Court correctly held respondent exempt from liability thereunder because it had used "due diligence in providing a seaworthy vessel"; and that, in any event, under the case of Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L. Ed. 89, the Zesta being a private carrier, the burden of proving a breach of the warranty of seaworthiness rested upon the libelants, which burden they failed to discharge.

We think the theory upon which this case was tried and decided below clearly entitles libelants to raise the issue of whether there has been a breach of warranty as to seaworthiness of the vessel. In pertinent part, the libel alleges that the cargo was "damaged by reason of the said vessel's unseaworthiness and unfitness to carry such shipment", and respondent introduced the charter party agreement in its entirety as a part of its answer to the libel. As heretofore noted, it was mutually understood by counsel for both parties from the inception of the trial that the issue of liability must be determined from the original charter agreement.[5] It does not appear that respondent has been prejudiced or the District Court in any way misled by libelants' position, for respondent has had knowledge throughout this proceeding of all

5. At the trial the following colloquy occurred:

"Mr. Batchelor: Before I start out, I would like to ask Mr. Fowler, if I understand his last statement, if they contend that this charter party governs the carriage on the Zesta on this trip?

"Mr. Fowler: That is right. Is that your contention, too?

"Mr. Batchelor: It certainly is. * * *"

provisions of the original charter agreement, and we may fairly assume that, in holding the typewritten provision restricting respondent's liability controlling, the District Court had opportunity to consider the other provisions relied upon. In this state of the record, we do not think libelants are attempting unfairly to pursue any theory of recovery which was not presented to the District Court. Cf. The Lydia, 2 Cir., 1 F.2d 18. Furthermore, regardless of whether libelants, as sub-charterers, may claim privity of contract with the owner sufficient to maintain an action *in personam,* they are still entitled to maintain the present *in rem* suit against the vessel for damages to the cargo. Perez v. Cia Tropical Exportadora, 5 Cir., 182 F.2d 874, 875; see also Romano v. West India Fruit & Steamship Co., 5 Cir., 151 F.2d 727.

■ Though we agree with the respondent's assertion that, as a private carrier, it had the right to restrict its liability as it saw fit, we cannot agree with its contention and the District Court's finding that the typewritten provision exempting it from liability except for actual negligence of the crew is controlling, for an inspection of the original charter agreement reveals that both the clause warranting seaworthiness and refrigeration equipment, and the clause restricting respondent's liability, except for negligence, were inserted as typewritten provisions into the printed charter agreement, as a result of which both of them should be construed together and as having equal dignity in relation to the other provisions of the charter agreement. The Framlington Court, 5 Cir., 69 F.2d 300; Standard Oil Co. of California v. U. S., D.C.S.D. Cal., 59 F.Supp. 100. In any event, we do not think the particular typewritten provision relied upon may be construed in isolation so as to read the provision warranting seaworthiness and the refrigeration equipment completely out of the charter agreement and render it otherwise meaningless, which seems to us the necessary effect of the District Court's decision. It appears to us that both typewritten provisions are susceptible of a harmonious construction, i. e., that, if the Zesta had been delivered to libelants with its refrigeration equipment "in perfect mechanical working condition", as required by the first provision, then the vessel's owners might simultaneously have restricted their liability for damage to cargo under the other typewritten provision solely to "actual negligence on the part of the crew".[6] It is true, however, that as between two inserted typewritten provisions and the printed portion of the charter agreement incorporating the Carriage of Goods by Sea Act, the various provisions are fairly subject to conflicting interpretations, for the latter Act places the burden of showing due diligence to make the vessel seaworthy on the owner of the vessel, and expressly invalidates any other provisions of the agreement insofar as they may be subject to a construction in conflict with this requirement. See 46 U.S.C.A. § 1304; The Agwimoon, D.C.Md., 24 F.2d 864; The Cornelia, D.C.S.D.N.Y., 15 F.2d 245. But we regard the asserted conflict between the typed and printed provisions as immaterial in this litigation, for, if the typewritten provisions be viewed as controlling over the printed embodiment of the Act, then the express warranty as to seaworthiness and operative condition of the refrigeration equipment may not be ignored as mere surplusage, but required a showing by respondent that the vessel when delivered was in the stated condition, which proof is wholly lacking in this record. On the other hand, if

**6.** Counsel for libelants concedes in brief that these two typewritten provisions may logically be construed together without any conflict, and upon the oral argument counsel for respondent made a like concession, at the same time asserting that, though a proven breach of warranty of seaworthiness might have justified recovery of the charter party pay, respondent's liability for damages to cargo was restricted to the negligence of the crew.

the exception to liability in the Act for exercising due diligence controls, then respondent had the burden of showing due diligence to make the vessel seaworthy, which burden we also think it failed to carry.[7] Thus, under either view, we think libelants were entitled to a recovery.

 We do not think the case of Commercial Molasses Corp. v. New York Tank Barge Corp., supra, so strongly relied upon by respondent, requires a different result here. That decision involved a contract of private carriage different in terms from this charter agreement, and contains language expressly distinguishing libelants' obligation with respect to the burden of proof from a situation where, as here, "the burden of proving seaworthiness rests upon the vessel *when it * * * has assumed the obligation of a common carrier.* * * *"* (Emphasis ours.) 314 U.S. 104, 108, 62 S.Ct. 156, 160. Here, libelants having proved delivery of the banana cargo in good condition and its arrival in bad condition, and further having shown that the refrigeration equipment did not perform as warranted in the charter agreement, we think the owners of the vessel had the burden of going forward with evidence either showing that the damage was not caused by the unseaworthy condition of the Zesta and its defective refrigeration equipment, or that they had used due diligence to make the vessel seaworthy for this particular voyage. Waterman S. S. Corp. v. United States S. R. & M. Co., 5 Cir., 155 F.2d 687, 690; The Framlington Court, supra, 69 F.2d at page 303; Aetna Ins. Co. v. Florida Towing Corp., D.C.S.D.Fla., 37 F.Supp. 781, 783; cf. Lucayan Transports, Ltd. v. McCormick Shipping Corp., 5 Cir.,

188 F.2d 202. Having failed to offer sufficient proof in either respect, and the evidence being practically conclusive that the bananas were delivered for shipment in good condition and the Zesta's refrigeration apparatus was not in the condition stipulated, we think libelants are entitled to a decree for their proven damages, in the amount of $13,382.17.

The judgment of the District Court dismissing the libel is reversed and the cause remanded with directions to enter judgment in the above amount in favor of the libelants.

Reversed and remanded with directions.

---

7. We are mindful of the District Court's contrary finding in this regard, but hereby reject that finding as unsupported by the record, and in the exercise of our right to review the case de novo "and make such decree as ought to have been made." See Pavlis v. Jackson, 5 Cir., 131 F.2d 362, 363; Waterman S. S. Corp. v. United States S. R. & M. Co., 5 Cir., 155 F.2d 687, 690. For further discussion of the various rules of review in admiralty see also, Coyle Lines v. United States, 5 Cir., 195 F.2d 737, 739, and C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850, 853–854; Annotation 103 A.L.R. 775.