**UNITED DISTILLERS OF AMERICA, Inc., Libelant,**

v.

**THE T/S IONIAN PIONEER, her engines, tackle, etc., and her owner, Ionian Steamship Co. of Athens, Respondent.**

No. 2020.

United States District Court
E. D. Louisiana, New Orleans Division.
April 27, 1955.

Deutsch, Kerrigan & Stiles, Brunswick G. Deutsch, Francis Emmett, New Orleans, La., for libelant.

Chaffe, McCall, Toler & Phillips, Leon Sarpy, New Orleans, La., for respondent.

WRIGHT, District Judge.

The Ionian Pioneer was a 35-year-old steel tank ship. She was owned by Greeks, flew the Panamanian flag, and was manned by the flotsam of many countries. She was rusty, she was leaky, she was hogged.[1] More importantly, and most unfortunately, she had an unpredictable penchant for sheering to port at the most inopportune moments. On two such sheers, she went aground and libelant here has sued for the value of the cargo lost by jettison as a result of these strandings. A short time after the incidents in suit, the vessel lost its classification and was considerately consigned to scrap.

The parties to this litigation entered into a private charter, or contract of affreightment, under which respondent was to move two cargoes of molasses from West Indian ports to a Gulf port of the United States. The charter contained a limited warranty of seaworthiness as well as several exceptions to liability for damage to the cargo. Libelant contends that the cargo loss resulted from unseaworthiness of the vessel, caused by the owner's lack of due diligence, while respondent claims that the vessel was seaworthy in all respects and that the incidents in suit resulted from faults in the navigation of the vessel for which the owner would not be liable under the exceptions in the charter.

The Ionian Pioneer was built in 1916. She had an overall length of 405 feet,

---

1. Depth at bow and stern greater than amidship.

beam of 51 feet, and a depth of 30 feet. She was powered by a single triple-expansion, reciprocating, steam engine of 2,500 HP, and was steered by a telemotor and steam steering engine. She was classified by Lloyd's Register of Shipping as 100 A–1. Her last four-year survey by Lloyd's prior to the strandings on September 28 and October 5, 1951 was in October, 1947, but she had received the cursory annual inspections since that time. Following the strandings in suit, the Ionian Pioneer was again inspected by a representative of Lloyd's and her class was extended for three months, subject to extensive recommended repairs. The repairs were not effected and she lost her class in January, 1952, was laid up the following month, and scrapped the following year.

The record shows that the Ionian Pioneer was in the evening of her useful life. From 1948 when she was acquired by respondent, she was patched and repaired time after time in order that her usefulness might be slightly extended. She was a riveted ship, but her hull was warped by the gripping effect of many welded partial plates made necessary by the ravages of time. In addition, she had a hog,[2] variously estimated from six to nine inches.

On August 17, 1951, the Ionian Pioneer encountered a hurricane. She suffered extensive damage, including damage to her steering apparatus. Her log shows that subsequent to the storm, she experienced steering gear trouble, that she steered badly, that the steering gear was laboring, and that there appeared unusual knocking in the steering engine. On her arrival at New York, following her encounter with the storm, the Ionian Pioneer was extensively repaired under the supervision of respondent's port engineer. No representative of Lloyd's or other classification society was called to inspect the vessel, and no repairs of any kind were made to the telemotors, the steering engine, or other steering gear.

On September 20, 1951, the Ionian Pioneer departed New York for La Romana, Dominican Republic, to lift a portion of libelant's cargo pursuant to the terms of the charter. While in La Romana, it was discovered by the captain and chief engineer that approximately 200 tons of sea water had entered the Ionian Pioneer's wasted shell plating in the way of her engine room spaces. The vessel's pumps, because of their deteriorated condition, were unable to discharge the water. On September 27, 1951, the Ionian Pioneer departed La Romana for San Pedro de Macoris, Dominican Republic, to complete loading. As the vessel was entering the harbor of San Pedro, a sudden sheer to port brought her outside the entrance channel. It was necessary to call a tug to push the vessel back into the channel and to assist her to the loading berth.

When loading was completed at San Pedro, the vessel had a freeboard amidship of less than four feet, which meant that she was actually overloaded 1 foot 9 inches below her summer load line, and 1 foot 3¼ inches below her tropical load line. With due allowance for her hog, the vessel was overloaded 2 feet 6 inches below her summer and 2 feet ¼ inch below her tropical limits as fixed by law. Her draft forward was 26 feet 6 inches, her draft aft was 27 feet, with a mean draft of 26 feet 9 inches. The dredged channel leading out from San Pedro was approximately 35 feet deep.

Under these conditions, at dusk on the evening of September 28, 1951, the Ionian Pioneer departed her berth at San Pedro de Macoris bound for New Orleans. She still had approximately 200 tons of sea water under her engine room spaces and her pumps were still unable to discharge this water. Further, no repairs of any kind had been made to her steering apparatus, in spite of the damage done by the hurricane of August 17. The Ionian Pioneer was assisted from her berth at San Pedro by a tug which cast off when

**2.** As to the effect of hogging on the unseaworthiness of a vessel, see Republic of France v. French Overseas Corp. (The Malcolm Baxter, Jr.), 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901.

the vessel was straightened out in the channel. The lights of the channel buoys were burning. As the Ionian Pioneer passed Buoy No. 2, the pilot noticed that she was again falling off sharply to port, and before corrective measures could be taken, her bow stranded on a sand bank approximately 1,000 feet from the dredged channel in which she had been proceeding. At the time there were no adverse conditions of wind, tide or sea which could have accounted for the vessel's action. Cargo was transferred from the forward tanks to the after tanks until the stern of the vessel was in danger of submerging. When the vessel still did not come off the strand, the captain ordered the cargo from Tanks 1 and 2 be discharged into the sea until the vessel floated free.

The vessel, with some difficulty in steering, returned to her berth at San Pedro where, after inspection, it was determined that she would continue her voyage. She departed San Pedro a second time on September 30, 1951 with the pilot again having difficulty with her steering gear. As the vessel proceeded around the western tip of Haiti, she was instructed by cable from respondent to proceed to Nuevitas, Cuba, for bunkers, a deviation [3] made necessary by the owner's refusal, after request from the captain, to purchase bunkers at San Pedro because the price there was too high. Before going in to the harbor of Nuevitas, the master of the Ionian Pioneer decided to stop the engines of the vessel while she was still at sea in order to test the steering gear. After twenty minutes of testing, she got underway again and proceeded to enter the harbor. With considerable difficulty from her steering apparatus, the pilot brought the ship to anchorage where she remained overnight. Upon leaving Nuevitas the following morning, the vessel again drifted off to port and stranded. After a few hours on the strand, the Ionian Pioneer floated free on the flood tide. She continued out the channel but again sheered to port and headed for the shore, requiring the pilot to let go the anchor to prevent her from stranding.

The vessel arrived off the mouth of the Mississippi River on October 9, 1951 where she was boarded by a Mississippi bar pilot. In attempting to enter South Pass, the vessel again took two sharp sheers to port, narrowly escaping collision with other vessels. The steering became so erratic, the pilot finally anchored her and refused to proceed until temporary repairs were effected.

Upon arrival at New Orleans, the telemotor of the vessel was partially opened up and several valves were found to be worn and leaking, the result of extensive wear and tear over a period of many months. The vessel then, having discharged her cargo, proceeded in ballast to a shipyard in Mobile, Alabama, for dry-docking and further repairs. The telemotor gear and steering engine were completely opened up and further debility was discovered in the form of worn leather cup plungers on the pistons and worn bearings and shaft on the steering engine. The condition of the telemotor and steering engine, as disclosed on inspection at New Orleans and Mobile, was such as would account for the erratic steering which had been experienced by the navigators of the vessel, at least since the hurricane of August 17, 1951.

At the outset, it may be well to distinguish the cases wherein a private charter, or contract of affreightment, is involved from those involving common carriers. A common carrier is more or less an insurer of the safety of the cargo. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89. It may exculpate itself from liability for damage to cargo only by showing first, that it used due diligence to furnish a seaworthy vessel, and second, that the cause of loss was within one of the narrowly restricted exceptions

---

**3.** As to the effect of an unwarranted deviation on the liability of the vessel for cargo loss, see The Willdomino v. Citro Chem. Co., 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491; The Pelotas, 5 Cir., 66 F. 2d 75, 1933 A.M.C. 1188.

from liability allowed by law. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. A carrier of goods by private charter, on the other hand, is not an insurer. Its contract is one of ordinary bailment, and the burden of proving a breach of the contractual obligation is on him who asserts it. Commercial Molasses Corp. v. New York Tank Barge Corp., supra. Nevertheless, the law imposes a duty on the private carrier, as the party in a better position to know the cause of the loss, to come forward with evidence available to it. The Northern Belle, 9 Wall. 526, 76 U.S. 526, 19 L.Ed. 746. If the carrier fails in this duty, an inference unfavorable to the carrier may be drawn from this failure. Commercial Molasses Corp. v. New York Tank Barge Corp., supra; Southern Ry. Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836.

Under the private charter in suit, the ship owner expressly warrants that it has exercised due care to provide a seaworthy vessel.[4] Thus the implied warranty of seaworthiness is limited to the exercise of due diligence. The Monarch of Nassau, 5 Cir., 155 F.2d 48, 1946 A.M.C. 853. Unless libelant can show that this warranty has been breached, it may not recover its cargo loss. However, once libelant here has shown that a breach of the warranty of seaworthiness proximately resulted in the loss, the exceptions to liability outlined in Paragraph 18 of the charter will not avail respondent, for Paragraph 18[5] provides for absence of liability for loss from the excepted causes only where the charter does not expressly provide otherwise.[6] Since the warranty of seaworthiness is otherwise provided in the charter, liability for damage to cargo may rest on breach of this warranty alone. Cooper v. Pinedo, 5 Cir., 212 F.2d 137, 1954 A.M.C. 899; The Framlington Court, 5 Cir., 69 F.2d 300, 1934 A.M.C. 272. And the fact that one of the exceptions to liability was a concurring proximate cause of the loss will not relieve respondent from liability.[7] Compania de Navegacion

4. The warranty in the charter reads: "The vessel, * * *, and being tight, staunch and strong, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's control excepted, * * *."

5. Paragraph 18 of the charter provides: "The vessel, her Master and owner shall not unless otherwise in this charter expressly provided, be responsible for any loss or damage arising or resulting from: "(1) any act or neglect on the part of the master, pilots, or other servants of the owner in the navigation or management of the vessel; "(2) collision, stranding or peril, danger or accident of the seas, or other navigable waters; "(3) any act or omission of the charterer or owner, shipper or consignee of the cargo, their agents or representatives; "(4) breakage of shafts, or any latent defects in hull, equipment or machinery; "(5) unseaworthiness of the vessel unless caused by want of due diligence on the part of the owner to make the vessel seaworthy, or to have her properly manned, equipped and supplied; "(6) or from any other cause of whatsoever kind arising without the actual fault or privity of the owner."

6. Actually, the exceptions in the charter do not relieve the vessel from liability for cargo loss resulting from inceptive unseaworthiness. They refer primarily to cargo loss from causes arising after the commencement of the voyage. See Schnell v. The Vallescura, supra; International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; The Carib Prince, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181; The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 1946 A.M.C. 1154; The Framlington Court, 5 Cir., 69 F.2d 300, 1934 A.M.C. 272.

7. As a matter of fact, as shown in the body of the opinion, the unseaworthiness of the Ionian Pioneer was the sole proximate cause of the cargo loss in suit, the stranding, like the cargo loss, being nothing more than the result of that unseaworthiness. See The Portsmouth, 9 Wall. 682, 76 U.S. 682, 19 L.Ed. 754.

652

La Flecha v. Brauer, 168 U.S. 104, 118, 18 S.Ct. 12, 42 L.Ed. 398; The Olga S., 5 Cir., 25 F.2d 229, 1928 A.M.C. 831. The inquiry here, therefore, is limited to whether the respondent has used due diligence to provide a seaworthy vessel and if not, did the resulting unseaworthiness cause the loss in suit.

■■ This court finds that the respondent failed to use due diligence to provide a seaworthy vessel, that the Ionian Pioneer was in fact unseaworthy, and that the unseaworthiness was the proximate cause of the loss of libelant's cargo. "Due diligence," as used in the statutes as well as in private charters, is not subject to rigid definition. Its meaning varies with the circumstances of the case. Initially it is clear that for the purpose of determining due diligence, not only may the conduct of the owner and his port employees be inquired into, but the owner is responsible as well for the conduct of the ship's personnel prior to the time the vessel breaks ground after lifting the cargo, in so far as that conduct may affect the seaworthiness of the vessel. International Nav. Co. v. Farr & Bailey Mfg. Co., supra; Nederlandsche Amerikaansche Stoomvaart Maatschappij v. Mediterranean & General Traders, Inc., 5 Cir., 17 F.2d 586, 1927 A.M.C. 509. Also, in determining due diligence, consideration may be given to the nature of the cargo, the age of the vessel, conditions of weather and sea reasonably to be anticipated on the voyage, and any other factor which might tend to enlarge or restrict the obligation imposed by the talismanic phrase "due diligence."

In performing its obligation under the contract of affreightment in suit, respondent used the Ionian Pioneer, a vessel thirty-five years old, whose condition as well as age behooved her owner to use the utmost care before allowing her to put to sea. The desire of a vessel owner to prolong the useful life of its vessel is understandable, but that desire does not in any way mitigate the owner's obligation to furnish a seaworthy vessel. In fact, the due diligence required in such circumstance must be more closely measured.

The Ionian Pioneer, judged by any standard, was unseaworthy.[8] She was not "reasonably fit to carry the cargo which she has undertaken to transport." The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241. In addition to her overall debility caused by advanced age, the steering gear of the vessel, one of her most vital organs, was allowed to deteriorate. Even after the vessel encountered the hurricane of August 17, after which her steering faults became more pronounced, respondent did nothing to have the gear repaired. The log of the vessel put the owner on notice that the steering gear was defective, yet it was not repaired in spite of the fact that other damage to the vessel caused by the hurricane was repaired immediately before the voyage in suit. Obviously respondent, realizing the Ionian Pioneer's days were numbered, was shaving costs at the risk of providing an unseaworthy vessel.

Unquestionably, therefore, when the Ionian Pioneer broke ground at San Pedro after completing her loading, she was unseaworthy by reason of respondent's failure properly to inspect and repair her steering apparatus. And it was this inceptive unseaworthiness which directly contributed to the strandings which resulted in the loss of cargo. Respondent suggests that the strandings, particularly the one at San Pedro, were caused by faulty navigation on the part of the pilot, that at San Pedro the vessel had only five feet of water under her keel, and that any vessel in shallow water becomes balky, unmanageable and prone to run off her course.

8. At the commencement of the voyage, the Ionian Pioneer was unseaworthy in the following respects: defective steering, wasted hull, inoperative pumps, hogging and insufficient bunkers.

Neither suggestion will save respondent. Not only the pilot at San Pedro, but four of the other pilots who handled the vessel on the voyage testified to the ship's steering defects, one going so far as to say that she was the worst ship he had ever piloted. The pilot on board at the time of the grounding at San Pedro testified that the vessel fell off sharply to port and stranded before she could be brought back into the channel. Other than the master, who did testify and whose testimony is not credited, the only witness who could have shed any light on the behavior of the vessel and the conduct of the pilot at the time of the stranding was the helmsman. In spite of the fact that he remained in the employ of respondent for some time after the grounding, and after depositions had been taken in this case, no deposition was taken from him nor was he produced at the trial. Libelant, therefore, is entitled to an inference that his testimony would have been unfavorable to respondent. Commercial Molasses Corp. v. New York Tank Barge Corp., supra.

Respondent's argument that all vessels are balky in shallow water is self-defeating. The Ionian Pioneer's bottom would not have been so close to the bottom of the channel if the vessel had not been dangerously overloaded, another cause of unseaworthiness directly attributable to lack of due diligence on the part of the owner. The Glymont, 2 Cir., 66 F.2d 617, 1933 A.M.C. 1293; The Waalhaven, 2 Cir., 36 F.2d 706, 1930 A.M.C. 27. Moreover, if the vessel had not been so badly overloaded, it would have been possible for the master, when the vessel stranded, to transfer more of the cargo from the forward holds to the after holds instead of jettisoning 800 tons of molasses into the sea so the vessel would float free of the strand.

Decree for libelant in accord with this opinion and the Findings of Fact and Conclusions of Law this day entered.